1
2
3
4
5
6
7
8                         **UNITED STATES DISTRICT COURT**

9                         **EASTERN DISTRICT OF CALIFORNIA**

10

11   OSWALDO ERNESTO HERNANDEZ-         Case No. 1:25-CV-01574 JLT SAB
     CASTRO,
12                                      ORDER GRANTING IN PART
                        Petitioner,     PETITIONER'S REQUEST FOR
13                                      TEMPORARY RESTRAINING ORDER AND
     v.                                 REFERRING MATTER TO ASSIGNED
14                                      MAGISTRATE JUDGE
     LYONS et al.,
15                                      (Doc. 2)
                        Respondents.
16

17   **I.      INTRODUCTION**

18           Before the Court for decision is Oswaldo Ernesto Hernandez-Castro's request for a

19   temporary restraining order, (Doc. 2), filed in conjunction with his petition for a writ of habeas

20   corpus brought under 28 U.S.C. § 2241 challenging his ongoing immigration detention.  (Doc. 1.)

21   Having evaluated the TRO request, (Doc. 2), Respondents' opposition, (Doc. 9), and Petitioner's

22   reply, (Doc. 11), in light of the entire record, the Court **GRANTS IN PART** the requested TRO

23   and REFERS the matter to the assigned magistrate judge for a determination on the merits.

24   **II.     FACTUAL & PROCEDURAL BACKGROUND**

25           Petitioner is a native and citizen of El Salvador who first entered the United States on July

26   30, 2007, without inspection or parole.  (Doc. 2-1 at 8.)  Petitioner is married and has three

27   children.  (*Id*. at 9, 15.)  For the past three years, Petitioner has maintained steady employment in

28   construction, painting, cleaning, and as a driver for Uber and DoorDash.  (*Id*. at 15.)  There is no

1    indication in the record that Petitioner has a criminal history.  (*See generally* Docs. 1, 2, 9, 11.)

2         Petitioner was first apprehended by Customs and Border Patrol on October 30, 2009, at a

3    checkpoint while riding a Greyhound bus.  (Doc. 2-1 at 8.)  At that time, Petitioner expressed fear

4    of returning to his home country due to threats he had received from gang members directed to

5    him and his family. [1]  (*Id.* at 9.)  Petitioner also requested release on bond, which was denied.

6    (*Id.*)  Soon after, on November 3, 2009, Department of Homeland Security and Immigration and

7    Customs Enforcement issued a notice to appear charging the Petitioner under Immigration and

8    Nationality Act ("INA") § 212(a)(6)(A)(i) for being present without admission or parole.  (Doc.

9    2-1 at 7–9.)  On November 4, 2009, Petitioner attended a hearing before an Immigration Judge.

10   (*See* Doc. 9-1 at 5.)  At the hearing, the IJ denied Petitioner's request for voluntary departure and

11   issued a final order of removal. (*Id.*) Petitioner waived his right to an appeal.  (*Id.*)  On November

12   24, 2009, the IJ issued a formal summary of the hearing.  (*Id.*)  On December 16, 2009, Petitioner

13   was deported to El Salvador.  (Doc. 9 at 1; *see also* Doc. 9-1 at 12.)

14        On November 16, 2022, Petitioner unlawfully re-entered the United States and was

15   immediately apprehended by CBP.  (Doc. 2-1 at 9; Doc. 9 at 1.)  The next day, DHS issued a

16   Reinstated Order of Removal.  (Doc. 2-3 at 2.)  A couple of days later, on November 24, 2022,

17   DHS released the Petitioner and placed him on an Order of Supervision ("OSUP"). [2]  (Doc. 2-3 at

18   3–5.)  According to Respondents, Petitioner did not claim fear of persecution at that time.  (Doc.

19   9 at 4; Doc. 9-1 at 2.)  On November 26, 2022, DHS enrolled the Petitioner in weekly biometric

20   reporting.  (Doc. 2-1 at 9.)  About a year later, Petitioner filed an I-589 Application for Asylum

21

22   [1]  It is unclear whether Petitioner filed an application for asylum and withholding of removal in 2009 or in 2023.  The
     record includes a notice from DHS dated October 21, 2025, indicating that Petitioner's I-589 Application for Asylum
23   and Withholding of Removal was received November 24, 2009.  (Doc. 2-3 at 19.)  However, Petitioner claims that he
     first filed his I-589 Application on November 14, 2023, (Doc. 2-1 at 9), and the record includes another notice dated
24   December 5, 2023, which instead that Petitioner's I-589 Application was received November 14, 2023.  (Doc. 2-3 at
     17.)
25
     [2]  According to Petitioner, his release on order of supervision means that "ICE found that Petitioner was neither a
26   flight risk nor a danger to the community." (Doc. 1 at 2.)  Petitioner states that, "[i]mplicit in [the decision to release
     him] was a finding that Petitioner was nonviolent and would remain so if released, that he was not likely to pose a
27   threat to the community if released, that he was not likely to violate the conditions of his release, and that he did not
     pose a flight risk."  (Doc. 2-1 at 7 (citing 8 C.F.R. §§ 241.4(d)(1), (e)).)  However, the Order of Supervision only
28   indicates that the Petitioner was released "[b]ecause the agency ha[d] not effected [his] deportation or removal during
     the period prescribed by law."  (Doc. 1-1 at 4; Doc. 2-3 at 3.)

and Withholding of Removal (Doc. 2-1 at 9; *see also* Doc. 2-3 at 17) an I-765 Application for Employment Authorization.  (Doc. 11-1 at 4.)  In April 2024, DHS sent an approval notice for Petitioner's work authorization, a class C18 work authorization, valid from April 2, 2024, to April 1, 2025. [3] (*Id*.)  Petitioner asserts that he had submitted a new application for his expired employment authorization card.  (Doc. 11 at 8.)

For approximately three years, from November 24, 2022, until October 30, 2025, Petitioner was on supervised release.  During this period, Petitioner claims that he "attended regularly scheduled check-ins with ICE."  (Doc. 1 at 2.)  However, Respondents indicate that Petitioner violated his conditions of supervised release on at least four occasions.  (Doc. 9 at 1.)  According to DHS, Petitioner "failed to complete a scheduled biometric check-in as required under . . . the Alternatives to Detention (ATD) program" on February 28, 2023, March 14, 2023, and April 18, 2023.  (Doc. 9-1 at 8.)  Petitioner also "failed to report in person" on April 18, 2024, and "failed to report to a virtual office visit" on May 17, 2024, as required by the ATD program.  (*Id*.)

On October 14, 2025, ICE mailed notice to Petitioner regarding the scheduling of a reasonable fear interview.  (Doc. 2-3 at 7.)  The notice indicated that an interview was scheduled for October 21, 2025.  (*Id*.)  Petitioner and his immigration attorney, Cecily Clements, indicate that they did not receive the notice in time, which caused them to miss the appointment.  (Doc. 2-1 at 8.)  On October 29, 2025, Ms. Clements emailed DHS to report the missed appointment and to request to reschedule the interview.  (*See* Doc. 2-3 at 14–16.)  DHS responded that same day and indicated that the interview would be rescheduled within the next two weeks.  (*Id*. at 14.)  Immediately after failing to appear for his interview, Petitioner was contacted through his mobile OSAP application and directed to attend an in-person check-in scheduled for October 30, 2025, at

---

[3] Petitioner argues that under 8 U.S.C. § 1231(a)(7), "Respondents have effectively acknowledged that Petitioner's removal is 'otherwise impracticable or contrary to the public interest,'" thereby indicating there is no significant likelihood of Petitioner's removal.  (Doc. 11 at 9); *see also* 8 U.S.C. § 1231(a)(7) ("No alien ordered removed shall be eligible to receive authorization to be employed in the United States unless the Attorney General makes a specific finding that—(A) the alien cannot be removed due to the refusal of all countries designated by the alien or under this section to receive the alien, or (B) the removal of the alien is otherwise is impracticable or contrary to the public interest.").

1   the San Jose DHS office.  (Doc. 2-1 at 9.)  When Petitioner arrived for this check-in, he was

2   arrested by ICE.  (*Id*.)  Petitioner was transferred to the California City Detention Facility, where

3   he remains.  (*Id*.; *see also* Doc. 9 at 4.)

4           On the day of his arrest, DHS issued and served a notice of revocation of Petitioner's

5   order of supervision.  (Doc. 9-1 at 8–10.)  The notice indicated that DHS revoked Petitioner's

6   release on supervision because of "changed circumstances" in that there was an "outstanding

7   order of removal" against him, and due to the series of OSUP violations dating back to February

8   2023.  (*Id*. at 8.)  The notice also indicated that Petitioner was to remain in ICE custody pending

9   removal pursuant to 8 C.F.R. §§ 241.4 and 241.13.  (*Id*. at 8.)  Finally, the notice stated Petitioner

10  would receive a prompt informal interview where he would have the opportunity to respond and

11  submit evidence in support of his release.  (*Id*.)  Petitioner claims to have not received the

12  informal interview or an opportunity to contest the revocation, and Respondent offers no evidence

13  to the contrary.  (Doc. 2-1 at 26; *see* Doc. 9 at 8.)  On that same day, DHS also issued and served

14  a second Reinstated Order of Removal, which stated that Petitioner was subject to deportation

15  under INA §241(a)(5), also found in 8 U.S.C. § 1231(a)(5).  (Doc. 9-1 at 12.)

16          On November 4, 2025, while in ICE custody, Petitioner underwent a reasonable fear

17  interview with an asylum officer.  (Doc. 2-1 at 10.)  On November 6, 2025, the officer found that

18  Petitioner did not establish a reasonable fear of persecution or torture.  (Doc. 9-1 at 15.)

19  Petitioner requested a review of such determination in accordance with 8 C.F.R. §§ 208.31(f) and

20  (g).  (*Id*.)  On November 18, 2025, Petitioner appeared before an IJ to present testimony and to

21  request a review of the officer's negative fear determination.  (Doc. 2-1 at 8; *see also* Doc. 9-1 at

22  3, 18–19.)  The IJ found that Petitioner had "not established a reasonable possibility that [he]

23  would be persecuted on the basis of a protected ground, or a reasonable possibility that [he]

24  would be tortured in the country of removal."  (Doc. 9-1 at 18.)  The IJ ordered the case returned

25  to DHS for removal of Petitioner and indicated that no administrative appeal of the decision was

26  available under 8 C.F.R. § 1208.31(g)(1).  (*Id*.)

27          On November 10, 2025, Petitioner appealed his reinstated order of removal to the Ninth

28  Circuit Court of Appeals, which issued a temporary stay of removal under General Order 6.4.  *See*

Dkt. 1 & 8, *Hernandez Castro v. Bondi* (9th Cir. 2025) (No. 25-7116).[4]  Then, on November 17, 2025, Petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, alleging that his detention violates his Fifth Amendment right to substantive and procedural due process. (Doc. 1 at 19–21.)  He also advances a series of claims arising under the Administrative Procedure Act.  (Doc. 1 at 21–26.)  He seeks immediate release from custody; a declaration that his rights were violated under the Fifth Amendment, INA regulations, and the APA; an injunction prohibiting his transfer away from this District or deportation pending the conclusion of his appeal; an injunction against his re-detention without a pre-deprivation hearing before a neutral decisionmaker to evaluate whether Petitioner is a flight risk or danger to the community; an injunction against any additional restrictions or conditions for supervised release; and an award of costs and attorney's fees.  (Doc. 1 at 26.)  On that same day, Petitioner also filed a motion for a temporary restraining order, reiterating the same arguments and requesting the same relief.  (*See* Doc. 2-1 at 7, 10–26; Doc. 2-2 at 2.)

On November 20, 2025, the Court issued a Minute Order calling for the filing of an opposition and reply related to the TRO.  (Doc. 8.)  Respondents filed their opposition on December 2, 2025, (Doc. 9), and Petitioner filed his reply on December 5, 2025, (Doc. 11). Having considered the entire record, the Court **GRANTS IN PART** the request for preliminary injunctive relief and refers the matter to the assigned magistrate judge.

### III.    JURISDICTION

#### A.  Habeas Corpus

Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of habeas corpus in which the petitioner asserts he is being held in custody "in violation of the Constitution or laws or treaties of the United States."  "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."  *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973). Petitioner seeks his immediate release from custody, which he contends violates the Fifth

---

[4] For some unknown reason, there are two pending appeals in relation to Petitioner's immigration case.  *See also* Dkt. 1, *Hernandez Castro v. Bondi* (9th Cir. 2025) (No. 25-7502).

1  Amendment Due Process Clause under the United States Constitution.  (*See* Doc. 1; Doc. 3.)

2  Thus, he properly invokes the Court's habeas jurisdiction.

3        **B.  Judicial Review under the INA**

4       The INA limits judicial review in many instances.  Though 8 U.S.C § 1252(g) precludes

5  this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

6  adjudicate cases, or execute removal orders against any alien," there is no removal order at issue

7  here and the central issue is Petitioner's continued detention.  Thus, this Court has the authority to

8  review the termination of Petitioner's release.  *See Jennings v. Rodriguez*, 583 U.S. 281, 294

9  (2018) (holding that § 1252(g) precludes judicial review only as to the three areas specifically

10  outlined in the subsection); *see also Reno v. American–Arab Anti–Discrimination Comm.*, 525

11  U.S. 471, 482 (1999).

12  **IV.    ANALYSIS**

13       The standard for issuing a TRO is the same as the standard for issuing a preliminary

14  injunction.  *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co*., 240 F.3d 832, 839 n. 7 (9th Cir.

15  2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

16  "substantially identical").  When seeking a TRO or PI, plaintiffs must establish: (1) they are

17  "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

18  the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

19  "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

20  (2008).  The moving party has the burden to "make a showing on all four prongs" of the *Winter*

21  test to obtain a preliminary injunction.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

22  1135 (9th Cir. 2011).  Thus, the moving party has "the burden of persuasion."  *Mazurek v.*

23  *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023).  The

24  Court may weigh the request for a preliminary injunction with a sliding-scale approach.  *Alliance*,

25  at 1135 (9th Cir. 2011).  Accordingly, a stronger showing on the balance of hardships may

26  support the issuance of a preliminary injunction where there are "serious questions on the merits .

27  . . so long as the plaintiff also shows that there is a likelihood of irreparable injury, and that the

28  injunction is in the public interest."  *Id*.  "A preliminary injunction is an extraordinary remedy

1    never awarded as of right." *Winter*, 555 U.S. at 24.  Preliminary injunctions are intended to

2    "merely [] preserve the relative positions of the parties until a trial on the merits can be held, and

3    to balance the equities at the litigation moves forward." *Lackey v. Stinnie*, 604 U.S. ___, 145 S.

4    Ct. 659, 667 (2025) (citations omitted).

5        The status quo refers to "the last uncontested status which preceded the pending

6    controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

7    *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)).  In the

8    Court's view, that is the status before Petitioner was arrested. *See Kuzmenko v. Phillips,* No. 25-

9    CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10, 2025) (granting a temporary restraining

10   order requiring immediate release of the petitioner back to home confinement from custody, as a

11   restoration of the status quo).

12       **A.  Likelihood of Success on the Merits**

13       This first factor "is the most important" under *Winter*, and "is especially important when a

14   plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th

15   Cir. 2023).  Petitioner argues he is likely to succeed on the merits of his due process and APA

16   claims because DHS's actions—namely, the revocation of his supervised release—constitutes

17   ultra vires agency action, fails to comply with applicable regulations, relies on an official who

18   lacks delegated authority to revoke his order of supervision, and violates his due process right to a

19   pre-deprivation hearing.  (*See* Doc. 2-1 at 10–12, 14–21, 23–26.)  Petitioner also argues that he is

20   likely to succeed on the merits because his detention bears no reasonable relationship to any

21   legitimate purpose since his removal is not reasonably foreseeable.  (Doc. 2-1 at 22–23.)

22           *a.    Detention and Revocation of Supervised Release under 8 U.S.C. § 1231(a)*

23                 *and 8 C.F.R. §§ 241.4, 241.13*

24       The Court addresses the parties' arguments regarding the revocation of Petitioner's

25   supervised release in relation to DHS's 2022 reinstated order of removal and order of supervision.

26   (*See* Doc. 2-3 at 2–5.)  Petitioner contends that Respondents did not comply with relevant

27   regulations when revoking his supervised release and thereby violated his due process rights. [5]

28   _____

[5]  The Court declines to address his other claims and arguments at this time.

(Doc. 2-1 at 10–19, 25–26.)  Respondents contend that DHS has "extraordinarily broad discretion" to revoke orders of supervision under 8 C.F.R. § 241.4(l)(2), and that DHS complied with applicable procedures in doing so.  (Doc. 9 at 8).  Specifically, DHS revoked Petitioner's release (1) due to alleged OSUP violations and (2) to deport him to El Salvador in accordance with the October 2025 reinstated removal order.  (*Id.*)  The issue before the Court is whether Respondent's violated Petitioner's due process rights when they revoked his order of supervision without complying with regulations and without a pre-deprivation hearing?

> *i.*      *Detention Authority Under the Governing Regulations*

Under 8 U.S.C. § 1231(a)(5), the government may seek "expedited removal of an alien who was previously subject to a removal order but returned illegally to the United States." *Andrade-Garcia v. Lynch*, 828 F.3d 829, 831 (9th Cir. 2016).  This provision applies here because Petitioner was previously ordered removed in November 2009, (Doc. 9-1 at 5), was deported in December 2009, (*see* Doc. 2-3 at 2), and illegally re-entered the country in November 2022, (Doc. 2-1 at 9).  In such instances, the government may choose to initiate new removal proceedings or reinstate the prior order of removal, as the Respondents did here.  *Morales de Soto v. Lynch*, 824 F.3d 822, 825 (9th Cir. 2016); (Doc. 2-3 at 2).

In general, under 8 U.S.C. § 1231(a), "when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days," (e.g., the removal period).  8 U.S.C. § 1231(a)(1)(A).  The ninety-day removal period begins on the latest of the following:

> (i) The date the order of removal becomes administratively final.

> (ii) If the removal order is judicially reviewed and if a court orders a stay of removal of the alien, the date of the court's final order.

> (ii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B).  Once the removal period starts, the government "shall detain the alien[,]" but if the government cannot remove the non-citizen within the ninety-day window, "the alien, pending removal, shall be [released] subject to supervision under regulations prescribed by

the Attorney General." 8 U.S.C. §§ 1231(a)(2)(A), (a)(3); *see also Alva v. Kaiser*, No. 25-cv-06676-RFL, 2025 WL 2419262, at * 3 (N.D. Cal. 2025) (explaining that the default status after the 90-day removal period is release on conditions).  When a non-citizen, subject to a final or reinstated order of removal, is released on supervision, DHS must comply with 8 C.F.R. § 241.4 or 8 C.F.R. § 241.13.  *Diaz v. Wofford*, No. 1:25-cv-01079-JLT-EPG, 2025 WL 2581575, at * 4 (E.D. Cal. Sept. 5, 2025).

Under Section 241.4(e), "Before making any . . . decision to release a detainee, a majority of the Review Panel members, or the director of the HQPDU in the case of a record review, must conclude that: (1) Travel documents for the alien are not available or, . . . immediate removal . . . is otherwise not practicable or not in the public interest; (2) The detainee is presently a non-violent person; (3) The detainee is likely to remain non-violent if released; (4) The detainee is not likely to pose a threat to the community following release; (5) The detainee is not likely to violate the conditions of release; and (6) The detainee does not pose a significant flight risk if released." *J.L.R.P. v. Wofford*, No. 1:25-CV-01464-KES-SKO (HC), 2025 WL 3190589, at *1 (E.D. Cal. Nov. 14, 2025).  Alternatively, Section 241.13(b)(1) controls the non-citizen's release, if the "Service makes a determination . . . that there is no significant likelihood of removal in the reasonably foreseeable future," then the "Service may release an alien under an order of supervision under § 241.4 if it determines that the alien would not pose a danger to the public or a risk of flight."  In any event, to release a detainee under either regulation, DHS must decide that the non-citizen is not a flight risk or a danger to the community.

If release is revoked under Section 241.4(l)(2), then the revoking official must determine either that "(i) the purposes of release have been served; (ii) the alien violates any condition of release; (iii) it is appropriate to enforce a removal order or to commence removal proceedings against an alien; or (iv) the conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate."  Moreover, the non-citizen must be "notified of the reasons for revocation" and receive "an initial informal interview promptly after his or her return to Service custody" to have an opportunity to respond to the reasons for revocation.  8 C.F.R. § 241.4(l)(1).  Alternatively, under Section 241.13(i)(1), (2), release may be revoked for "[a]ny alien who . . .

1    violates any of the conditions of release" or "if, on account of changed circumstances, the Service

2    determines that there is a significant likelihood that the alien may be removed in the reasonably

3    foreseeable future."  In either case, the alien must also be "notified of the reasons for revocation"

4    and receive "an initial informal interview promptly after his or her return to Service custody."  8

5    C.F.R. § 241.13(i)(3).

6                    *ii.        Due Process Requirements Under Applicable Regulations*

7                As a threshold matter, it is unclear why Petitioner was released on November 24, 2022,

8    seven days after DHS issued the 2022 reinstated order, and well before the ninety-day removal

9    period had expired.  (Doc. 2-3 at 2–3.)  Petitioner's order of supervision states that because "the

10   agency has not effected your deportation or removal during the period proscribed by law, it is

11   ordered that you be placed under supervision."  (*Id*. at 3.)  This suggests that § 241.13(b)(1) is the

12   controlling regulation because if the agency cannot effectuate removal during the "period

13   proscribed by law" (e.g., the ninety-day removal period), (Doc. 2-3 at 3), then arguably there is

14   "no significant likelihood [that] removal [is] reasonably foreseeable."  *See* 8 C.F.R. §

15   241.13(b)(1).  Under this regulation, DHS must have determined that Petitioner was not a danger

16   or flight risk at the time of his release.  *Id*.  Even if Petitioner's release was made pursuant to the

17   other regulation, DHS must have made that same determination.  8 C.F.R. § 241.4(e) (explaining

18   that DHS "must conclude that" that the detainee "is not likely to pose a threat to the community"

19   and "does not pose a significant flight risk" if released); *Saravia v. Sessions*, 280 F. Supp. 3d

20   1168, 1176 (N.D. Cal. 2017) ("Release [therefore] reflects a determination by the government

21   that the noncitizen is not a danger to the community or a flight risk.").

22               Petitioner argues that the ninety-day removal period began November 17, 2022—the date

23   the first reinstated order was issued—and ended on February 17, 2023.  (Doc. 11 at 5–7; Doc. 2-3

24   at 2.)  Alternatively, Respondents suggest that the removal period did not begin until October 30,

25   2025, (Doc. 9 at 8–9), the day DHS issued the second reinstated order of removal.  (*See* Doc. 2-3

26   at 6.)  Assuming the removal period began November 17, 2022, after Petitioner's re-entry into the

27   country, Petitioner would no longer be subject to mandatory detention under § 1231(a)(2)(A). [6]

28   _____

[6] Alternatively, if this Court uses the October 30, 2025, reinstated order of removal, (Doc. 9-1 at 12), Petitioner may

1    *See Alva*, 2025 WL 2419262, at * 3 ("Petitioner's 90-day removal period began to run on

2    December 1, 2018, the date that his removal order was reinstated after his reentry into the United

3    States."); *Diaz*, 2025 WL 2581575, at * 4 (explaining that the petitioner is no longer subject to

4    mandatory detention under § 1231(a) for a reinstated removal order issued on April 2019, whose

5    arrest occurred on August 2025).

6         Accordingly, Petitioner would be subject to release on conditions.  8 U.S.C. § 1231(a)(3);

7    *Alva*, 2025 WL 2419262, at * 3 ("As mandated by Congress, the default status after the 90-day

8    removal period is therefore release on conditions, not detention.").  Such release may not be

9    revoked absent compliance with procedures set forth in 8 C.F.R. § 241.4(1) or § 241.13(i), absent

10   a showing of flight risk or danger to the community, and absent a showing of a significant

11   likelihood that the alien will be removed in the foreseeable future.  *See Diaz*, 2025 WL 2581575,

12   at * 7–9; *Alva*, 2025 WL 2419262, at * 5; *J.L.R.P. v. Wofford*, No. 1:25-CV-01464-KES-SKO,

13   2025 WL 3190589, at *4–5 (E.D. Cal. Nov. 14, 2025).

14        Many courts in this circuit have found that petitioners in similar situations are entitled to

15   immediate release and a bond hearing in the event of future re-detention.  In *Diaz*, the Court

16   found that, where respondents failed to provide an informal interview or opportunity to be heard,

17   and the notice of revocation was vague, DHS violated due process in failing to comply with 8

18   C.F.R. § 241.4(l)(1).  *Diaz*, 2025 WL 2581575, at *1–2, 7–9 (pertaining to a non-citizen with a

19   reinstated order of removal who was released on supervision in April 2019 and re-detained in

20   August 2025).  The Court in *Diaz* granted immediate release and permanently enjoined

21   respondents from re-detaining petitioner absent compliance with the constitution and 8 C.F.R. §

22   241.4(l).  *Id*. at *10.

23        Similarly, the Court concludes that Petitioner's due process rights were violated.  *Id*. at *7

24

---

25   be subject to mandatory detention under 8 U.S.C. § 1231(a)(2), since the ninety-day removal period has not yet
     elapsed.  If that were the case, Petitioner would also have no claim under *Zadvydas* since the presumptive six-month
     detention period has not yet elapsed.  *See Zadvydas v. Davis*, 533 U.S. 678, 701 (2001).  Thus, as Respondents point

26   out, Petitioner's request for release would be "premature."  (Doc. 9 at 9.)  In any event, because the Ninth Circuit has
     stayed Petitioner's removal pending review of his most recent order of removal and negative fear determination,

27   Section 1231(a)'s mandatory detention provision does not apply at all.  *See* Dkt. 1 & 8, *Hernandez Castro v. Bondi*
     (9th Cir. 2025) (No. 25-7116); *Prieto-Romero v. Clark*, 534 F.3d 1053, 1059 (9th Cir. 2008) ("Therefore, the plain
     language of § 1231(a) provides no authority to detain aliens such as Prieto-Romero whose removal order is

28   *administratively*—but not *judicially*—final.") (emphasis in original).

1    ("DHS's failure to follow its own procedural regulations may constitute a due process

2    violation."). Petitioner contends that he never received a prompt informal interview under either 8

3    C.F.R. § 241.4(l)(1), or § 241.13(i)(3), or an opportunity to submit evidence in support of his

4    release as his notice of revocation indicates. [7]  (*See* Doc. 2-1 at 26; *see also* Doc. 9-1 at 8.)

5    Respondents offer no evidence to the contrary and indicate only that Petitioner received adequate

6    notice. (Doc. 9 at 8.) Noticeably absent from their discussion is any mention of the promised

7    prompt interview. (*Id.*) The failure to provide a prompt interview violates Petitioner's due process

8    rights. *Diaz*, 2025 WL 2581575, at *7–9 (finding likelihood of success on the merits because the

9    record showed lack of adequate notice and no opportunity to be heard in compliance with

10   applicable regulations); *see also M.S.L v. Bostock*, No. 6:25-cv-01204-AA, 2025 WL 2430267, at

11   *11–12 (D. Or. Aug. 21, 2025) ("ICE's failure to provide [p]etitioner with a timely [n]otice of

12   [r]evocation or conduct an informal interview until nearly a month after taking her into custody is

13   a grave violation of [p]etitioner's due process rights . . .")

14          The court in *Alva* found a due process violation for another reason.  *Alva*, 2025 WL

15   2419262, at *1–2 (pertaining to a non-citizen with a reinstated order of removal who was released

16   on supervision in December 2018 and was re-detained in August 2025). Because petitioner had a

17   protected liberty interest after being released for over six years, petitioner was entitled to a pre-

18   deprivation hearing prior to his re-detention.  *Id*. at *3–5.  The court explained that petitioner had

19   a "substantial private interest in remaining out of custody" because for the past years he had

20   developed attachments of normal life.  *Id*. at *4 (citing *Diaz v. Kaiser*, No. 3:25-cv-05071, 2025

21   WL 1676854 (N.D. Cal. June 14, 2025)). He had been employed on work authorization, living

22   with his family, and was regularly attending church.  *Id*.  Furthermore, because his "release from

23

24   [7] Petitioner also argues that Respondents violated 8 C.F.R. § 241.4(l)(2) because "[t]here is [] no evidence that
     [Petitioner's Order of Supervision] has been legally revoked for a permissible reason by an order signed by the

25   Executive Associate Director of ICE, someone to whom the Executive Associate Director has legally delegated
     authority, or a district director who has made specific findings that the circumstances do not reasonably permit

26   referral of the case to the Executive Associate Director." (Doc. 2-1 at 26.) According to Petitioner, under this
     regulation, only delegated officials have the authority to revoke an order of supervision, the delegation order must

27   explicitly cite their authority to do so, and there must be findings that revocation is in the public interest and that
     referral to the Executive Director is not reasonable. (Doc. 1 at 18.) Petitioner thus argues that this Court cannot

28   conclude that the revoking officer had the authority to revoke release. (Doc. 2-1 at 21 (citing *Ceesay v. Kurzdorfer*,
     781 F. Supp. 3d 137, 162 (W.D.N.Y. 2025)).)  The Court declines to address the delegation argument at this time.

1    ICE custody on December 12, 2018, reflected a determination by the government that he was

2    neither a flight risk nor a danger . . . [p]etitioner has a strong interest in remaining at liberty u*nless*

3    *he no longer meets those criteria*." *Id*. at *5 (emphasis added). The court found a due process

4    violation because the government failed to prove that petitioner now poses a danger or flight risk.

5    *Id*. at *5.

6        Similarly, as Petitioner notes, he developed a liberty interest during his three years of

7    release. (Doc. 2-1 at 14–15); *Alva*, 2025 WL 2419262, at *5 ("The over six years that he has

8    spent out of custody since ICE initially released him have only heightened his liberty interest").

9    During this time, Petitioner has obtained a work authorization, (Doc. 11-1 at 4), has obtained

10   steady employment and has provided for his family. (*See* Doc. 2-1 at 15, 18.) Though Petitioner

11   claims that during this period, he "attended regularly scheduled check-ins with ICE," (Doc. 1 at

12   2), Respondents argue that Petitioner violated his release terms on four separate occasions. (Doc.

13   9 at 1; *see also* Doc. 9-1 at 8.) Still, no neutral adjudicator has weighed these arguments or

14   considered whether Petitioner now presents a flight risk or danger to the community. As

15   explained above, when ICE released Petitioner on November 24, 2022, (Doc. 2-3 at 3), the

16   government must have concluded that he was neither a flight risk nor danger. *Alva*, 2025 WL

17   2419262, at *5; *see also* 8 C.F.R. §§ 241.4(e), 241.13(b)(1). Yet, apart from reference to

18   Petitioner's alleged OSUP violations, the government fails to argue that his detention is now

19   necessary due to flight risk or danger. Failure to provide Petitioner with a pre-deprivation hearing

20   before revoking his release violated his due process rights.

21       Finally, the Court in *J.L.R.P.*, found a due process violation for yet another reason—

22   namely, under 8 C.F.R. § 241.13(i)(2), when the government revokes release to effectuate a final

23   order of removal, ICE must first show that there is a significant likelihood of the alien's removal

24   within the reasonably foreseeable future. *J.L.R.P.*, 2025 WL 3190589, at *1–2, 4–5 (pertaining to

25   a non-citizen with a reinstated order of removal who was released on supervision in November

26   2021 and was re-detained in October 2025). Respondents' failure to "identify any changed

27   factual circumstances" or failure to "point to any facts indicating . . . a significant likelihood of

28   petitioner's removal in the reasonably foreseeable future" prior to petitioner's arrest violated his

1    due process rights. [8] *Id*. at *5. Similarly, here, Respondents claim that Petitioner's re-detention

2    was necessary, in part, "to enforce his October 30, 2025[,] reinstatement of his 2009 removal

3    order to El Salvador." (Doc. 9 at 8.) The notice of revocation also states that the revocation was

4    made based on a determination of "changed circumstances" and an "outstanding order of

5    removal." [9] (Doc. 9-1 at 8.) Accordingly, this would suggest that Respondents violated

6    Petitioner's due process for failing to show a significant likelihood of removal prior to revoking

7    his order of supervision. *J.L.R.P.*, 2025 WL 3190589, at *4–5.

8         Petitioner's supervised release was revoked *not only* to effectuate removal, but also due to

9    alleged OSUP violations, one of which includes a failure to appear at an in-person check-in.

10   (Doc. 9-1 at 8); *cf. J.L.R.P*., 2025 WL 3190589, at *2 ("Respondents do not dispute petitioner's

11   evidence that he fully complied with the terms of his order of supervision . . ."). Since the

12   petitioner in *J.L.R.P.* had no OSUP violations, the Court did not assess 8 C.F.R. § 241.13(i)(1),

13   which does not require a showing that respondent's removal is "reasonably foreseeable."

14   *J.L.R.P*., 2025 WL 3190589, at *3 n. 3. Similarly, *Escalante*, the case cited by Petitioner, (Doc. 2-

15   1 at 22–23), also relies entirely on § 241.13(i)(2) in finding that the government bore the burden

16   of showing likelihood of removal. *Escalante v. Noem*, No. 9:25-cv-00182, 2025 WL 2206113, at

17   *3 (E.D. Tex. Aug. 2, 2025). Here, it is unclear whether the government instead revoked

18   Petitioner's release under § 241.4(1) which does not require a showing of significant likelihood of

19   removal. [10] Therefore, this Court cannot find that the government bears such burden in this case.

20   ─────────────

21   [8]  *J.L.R.P.* explained that in these situations, the burden to show a significant likelihood of removal is on the
     government, not the alien detainee. *J.L.R.P.*, 2025 WL 3190589, at *4 (citing *Escalante v. Noem*, No. 9:25-cv-
     00182, 2025 WL 2206113, at *3 (E.D. Tex. Aug. 2, 2025) and *Nguyen v. Hyde*, 788 F. Supp. 3d 144, 150 (D. Mass.

22   2025)). The Court explained that the burden-shifting framework from *Zadvydas* does not apply when a non-citizen
     has been ordered removed, released on supervision, and re-detained. *Id*. (citations omitted). This is because ICE's
     authority to re-detain a non-citizen after having been issued a final order of removal and subsequently released on

23   supervision is controlled by § 241.13(i)(2), which clearly places the burden on DHS to show significant likelihood of
     removal. *Id*. (citations omitted); 8 C.F.R. § 241.13(i)(2) ("The Service may revoke an alien's release . . . if, on

24   account of changed circumstances, *the Service* determines . . . a significant likelihood . . . [of] remov[al] in the
     reasonably foreseeable future.") (emphasis added).

25
     [9]  Notably, at the time this Notice was issued and served on Petitioner, he did not yet have a reasonable fear

26   determination. The Notice was issued October 30, 2025, (Doc. 9-1 at 8–10), and Petitioner did not receive his
     negative fear determination until November 6, 2025. (*See* Doc. 2-1 at 10; Doc. 9 at 4.) Thus, Petitioner's negative

27   fear determination cannot constitute the basis for "changed circumstances" referenced in the notice.
     [10]  The Notice of Revocation cites both 8 C.F.R. § 241.4 and § 241.13 as the basis for revocation. (Doc. 9-1 at 8.) In

28   their opposition, Respondents contend that revocation was appropriate under § 241.4(1)(2)(i)–(iii) because the
     purposes of release have been served, Petitioner had committed a series of OSUP violations, and it was appropriate to

Additionally, Petitioner's situation differs from the cases mentioned above. Petitioner now has a negative fear determination from an asylum officer, which was affirmed by the IJ, and his removal has been stayed pending the Ninth Circuit's decision on appeal. (Doc. 9 at 1; Doc. 9-1 at 14–19); *cf. Diaz*, 2025 WL 2581575, at *2 (explaining that petitioner's asylum application was still pending and he was still awaiting a reasonable fear interview at the time he filed his habeas corpus petition); *cf. Alva*, 2025 WL 2419262, at *1 (explaining that, at most, petitioner had obtained a negative fear determination by an asylum officer and an IJ had not yet reviewed that determination); *cf. J.L.R.P.*, 2025 WL 3190589, at *2 (explaining that petitioner had obtained a positive fear determination by an asylum officer and petitioner was awaiting a proceeding by the IJ to determine whether he was entitled to withholding of removal). The stay of removal shifts the detention authority from 8 U.S.C. § 1231(a) to § 1226(a), which changes Petitioner's rights and entitlements. *Infra*, Section IV.A.b.i.; *Prieto-Romero*, 534 F.3d at 1059 ("The statute makes clear that when a court of appeals issues a stay of removal pending its decision on an alien's petition for review of his removal order, the removal period begins only after the court denies the petition and withdraws the stay of removal.").

Accordingly, the Court finds that these differences warrant a different form of relief. While the Court finds that Petitioner is likely to succeed on the merits of his due process claim, [11] the Court finds that Petitioner's unique circumstances warrant only a bond hearing before a neutral adjudicator to determine flight risk or danger.

> b. *Detention and Revocation of Supervised Release under 8 U.S.C. §1226(a) Where the Ninth Circuit Stays a Final Order of Removal*

A non-citizen who is seemingly detained under 8 U.S.C. § 1231(a) based on a final order of removal—where administrative review is complete, but removal is stayed by the court of appeals pending review of the case—is treated as if detained under 8 U.S.C. § 1226(a). *Prieto-Romero v. Clark*, 534 F.3d 1053, 1058 (9th Cir. 2008) ("We hold that the Attorney General's

---

enforce his order of removal. (*See* Doc. 9 at 8.)

[11] Specifically, Respondents failed to provide an informal interview as required under 8 C.F.R. §§ 241.4(l)(1), 241.13(i)(3) and failed to provide a pre-deprivation hearing prior to Petitioner's re-detention after having been released for three years on an order of supervision.

1    statutory authority to detain [petitioner], whose administrative review is complete but whose

2    removal is stayed pending the court of appeals' resolution of his petition for review, must be

3    grounded in § 1226(a).").

4                          *i.*        *Detention Authority*

5           In *Prieto-Romero*, the petitioner was a legal permanent resident who had been ordered

6    removed under § 1226(c) for being convicted of an aggravated felony, whose order of removal

7    was affirmed by the Board of Immigration Appeals, but whose case had been stayed pending

8    review by the Ninth Circuit. *Prieto-Romero*, 534 F.3d at 1056–57. He was in continuous ICE

9    custody from 2005 until 2008. *Id.* at 1056. He received two bond hearings in May 2005 and July

10   2005, where the IJ denied release on bond upon a finding of fight risk. *Id.* In June 2006, after

11   being in ICE detention for over a year, petitioner filed a petition for writ of habeas corpus with

12   the district court requesting immediate release. *Id.* at 1057. In February 2007, the district court

13   denied his petition for immediate release but ordered DHS to hold an additional bond hearing. *Id.*

14   At the third bond hearing, the IJ granted release on bond set at $15,000, which petitioner was

15   unable to pay. *Id.* Petitioner then appealed the denial of his habeas petition to the Ninth Circuit,

16   while the appeal of the IJ and BIA's merits decision was still pending review. *Id.* at 1056, 1057.

17          The Ninth Circuit held that the petitioner's continued civil detention, though lengthy, was

18   authorized, and affirmed the district court's denial of his writ petition. *Id.* First, the Ninth Circuit

19   found that DHS's detention authority was found in § 1226(a), instead of § 1231(a). *Id.* at 1058-

20   59. The Ninth Circuit explained:

21              Our conclusion follows from the plain language of the statute.
22              Section 1231(a) authorizes detention in only two circumstances.
                "*During* the removal period," the Attorney General "shall" detain
                the alien. *See* § 1231(a)(2) (emphasis added). "*[B]eyond* the
23              removal period," the Attorney General "may" detain an alien who
                falls within one of three categories specified by the statute. *See* §
24              1231(a)(6) (emphasis added). The "removal period" itself
                ordinarily lasts 90 days, but does not begin until the *latest* of the
25              following:

26              (i) The date the order of removal becomes administratively final.
                (ii) *If the removal order is judicially reviewed and if a court orders*
27              *a stay of the removal of the alien, the date of the court's final order.*
                (iii) If the alien is detained or confined (except under an
28              immigration process), the date the alien is released from detention

                                                    16

1    or confinement.

2        *See* § 1231(a)(1)(B) (emphasis added).

3    *Prieto-Romero*, 534 F.3d at 1059.  "The statute makes clear that when a court of appeals issues a

4    stay of removal pending its decision on an alien's petition for review of his removal order, the

5    removal period begins only after the court denies the petition and withdraws the stay of removal."

6    *Id*.  Put differently, when the appellate court issues a stay, the alien may not be detained under

7    any subsection of § 1231(a) unless and until the court finally denies the alien's petition for

8    review.  *Id*. at 1060.

9        The Ninth Circuit's statutory interpretation in *Prieto-Romero* affirms the analysis used by

10   the Western District Court of Washington.  *See Rodriguez-Carabantes v. Chertoff*, No. C06-

11   1517Z, 2007 WL 1268500, at *3 (W.D. Wash. May 1, 2007) ("Following the plain language of

12   INA § 241(a)(1)(B)(ii) [8 U.S.C. § 1231(a)(1)(B)(ii)], this Court has repeatedly held that when

13   the Ninth Circuit issues a stay of removal pending its review of a final administrative removal

14   order, the alien continues to be detained under INA  § 236 [8 U.S.C. § 1226] until the Ninth

15   Circuit renders its decision."); *see also Quezada-Bucio v. Ridge*, 317 F. Supp. 2d 1221, 1224

16   (W.D. Wash. 2004) (holding that because Petitioner's removal order has been stayed by the Ninth

17   Circuit pending its review of the BIA decision, the removal period has not yet commenced and

18   petitioner is therefore detained pursuant to INA § 236, entitling him to an individualized bond

19   hearing); *see also Roque v. Chertoff*, No. C06-0156, 2006 WL 1663620, at *3 (W.D. Wash. June

20   12, 2006).

21                    *ii.*        *Due Process Requirements*

22       Petitioner was detained under INA § 241(a)(5), 8 U.S.C. § 1231(a)(5), as indicated in

23   DHS's notice of decision to reinstate Petitioner's prior order of removal.  (Doc. 9-1 at 12.)

24   However, this Court finds that Petitioner is detained under INA § 236(a), 8 U.S.C. § 1226(a),

25   because Petitioner's reinstated order of removal has been stayed pending review by the Ninth

26   Circuit.  *See* Dkt. 8, *Hernandez Castro v. Bondi* (9th Cir. 2025) (No. 25-7116); *Prieto-Romero*,

27   534 F.3d at 1058; *Rodriguez-Carabantes*, 2007 WL 1268500, at *3.  Accordingly, due process

28   entitles Petitioner to a bond hearing before an independent adjudicator.  *Rodriguez-Carabantes*,

                                              17

1    2007 WL 1268500, at *2 (citing 8 C.F.R. § 236.1(d)(1)).

2         In *Rodriguez-Carabantes*, the petitioner had illegally reentered the Unites States in

3    January 2001, after having voluntarily departed to Mexico in December 2000 when the IJ ordered

4    him removed.  *Id*. at *1.  About five years later, on May 2006, ICE took petitioner into custody

5    and reinstated his prior order of removal pursuant to 8 U.S.C. § 1231(a)(5).  *Id*.  Petitioner

6    appealed his reinstated order of removal and on June 2, 2006, the Ninth Circuit issued a stay

7    pending resolution of his petition.  *Id*.  After about five months in ICE custody and in civil

8    detention, petitioner filed a petition for writ of habeas corpus with the court to challenge his

9    continued detention by ICE.  *Id*.

10        The court granted petitioner's request for a bond hearing.  *Id*. at *5.  The court explained

11   that "reinstatement of the removal order functions as a new final order of removal, which can

12   only be executed once Petitioner has entered the removal period."  *Id*.  "Because the Ninth Circuit

13   has stayed execution of the reinstated removal order, Petitioner has not entered the removal

14   period;" therefore remains detained under §1226(a) entitling him to a bond hearing.  *Id*.; *see also*

15   *Quezada-Bucio*, 317 F. Supp. 2d at 1231 ("The [c]ourt also agrees that those aliens should be

16   provided with individualized bond hearings pursuant to INA § 236(a)."); *Roque*, 2006 WL

17   1663620, at *3 ("The [c]ourt also agrees that petitioner is entitled to an individualized bond

18   hearing pursuant to the general release terms of INA § 236(a).").

19        Similarly, here, Petitioner illegally reentered the United States on November 16, 2022,

20   (Doc. 2-1 at 9), after having been deported to El Salvador on December 16, 2009, on a final order

21   of removal, (*see* Doc. 9-1 at 12).  On November 17, 2022, Petitioner's prior order of removal was

22   reinstated, (Doc. 2-3 at 2), but Petitioner was subsequently released on an order of supervision on

23   November 24, 2022.  (Doc. 2-3 at 3–5.)  Three years later, and prior to Petitioner's reasonable

24   fear determination scheduled for November 4, 2025, Petitioner was arrested at an in-person

25   check-in on October 30, 2025.  (Doc. 2-1 at 9, 10.)  At that time, Petitioner was given a notice of

26   revocation of his supervised release, and another reinstated order of removal.  (*See* Doc. 9-1 at 8–

27   12.)  Petitioner appealed his reinstated order of removal to the Ninth Circuit on November 10,

28   2025, and the Ninth Circuit stayed his removal on November 18, 2025, pending review of his

case. *See* Dkts. 1 & 8, *Hernandez Castro v. Bondi* (9th Cir. 2025) (No. 25-7116). Accordingly,

petitioner has not yet entered his "removal period" under § 1231(a) and therefore remains

detained under § 1226(a). As such, he is entitled to a bond hearing before a neutral adjudicator.

*Rodriguez-Carabantes*, 2007 WL 1268500, at *2.

In conclusion, the Court finds Petitioner is likely to succeed on the merits of his due

process claims. Because of Petitioner's unique circumstances (e.g., the stay of his removal

pending appellate judicial review), this Court finds entitlement only to a bond hearing before a

neutral adjudicator. *See Prieto-Romero*, 534 F.3d at 1068 (explaining that procedural due process

requires a bond hearing and an opportunity for the IJ to assess whether petitioner is a flight risk or

danger to the community). However, Petitioner is not entitled to immediate release at this time. [12]

*Id*. at 1065 ("We therefore hold that § 1226(a) permits Prieto-Romero's continuing detention

while he pursues judicial review of his administratively final order of removal.").

### B. Irreparable Harm

As for the second *Winters* factor, it is "well established that the deprivation of

constitutional rights 'unquestionably constitutes irreparable injury.'" *Hernandez v. Sessions*, 872

---

[12] In *Prieto-Romero*, the Court considered whether the petitioner was entitled to immediate release from ICE custody after having been detained for three years pending appellate judicial review. *Prieto-Romero*, 534 F.3d at 1056. The Court found that his "continued civil detention, although lengthy, is authorized by statute" because "Prieto-Romero foreseeably remains *capable* of being removed" and his continued detention is not indefinite. *Id*. at 1056, 1065 (emphasis in original). The Court explained, "[Petitioner] has been found removable by both the IJ and the BIA, but has sought judicial relief from that removal order, thereby delaying his deportation. Judicial review . . . is subject to strict procedural rules" which will be "resolved with reasonable expedition." *Id*. at 1064–65; *see also Lawrence v. Gonzales*, 446 F.3d 221, 227 (1st Cir. 2006) (holding that the alien's prolonged post-removal detention "was necessary to bring about [his] removal" when it "occurred pursuant to his own procuring of stays incident to his legal challenges"); *Soberanes v. Comfort*, 388 F.3d 1305, 1311 (10th Cir. 2004) (holding that the alien's detention during judicial review has a "definite and evidently impending termination point"). The Court noted, however, that consistent with *Zadvydas*, the Attorney General's detention authority under § 1226(a) has the same constitutional limitation as § 1231(a)(6). *Id*. at 1063. Neither provision authorizes indefinite detention, and both are limited to detention periods reasonably necessary to bring about the alien's removal. *Id*.; *cf. Nadarajah v. Gonzales*, 443 F.3d 1069, 1071, 1081 (9th Cir. 2006) (holding that the alien's continued detention was not authorized by statute because the alien successfully demonstrated no significant likelihood of removal where the BIA granted the alien's asylum and convention against torture applications, but whose detention continued for over five years while the government appealed the outcome of the agency proceedings). Nonetheless, the Court found that continued detention in petitioner's case did not pose a constitutional problem. *Prieto-Romero*, 534 F.3d at 1063–65.

Consistent with *Prieto-Romero*, in the event Petitioner is not released on bond and his detention continues pending appellate review, he may raise a constitutional challenge under § 1226(a) pending the resolution of his appeal. However, Petitioner will bear the burden of proving there is no significant likelihood of removal in the reasonably foreseeable future. *Id*. at 1068 (rejecting petitioner's *Zadvydas* challenge to his three-year detention under § 1226(a) because *he* has not established no significant likelihood of removal) (emphasis added); *Nadarajah*, 443 F.3d at 1081 (finding that the *petitioner* had established no significant likelihood of removal in the reasonably foreseeable future) (emphasis added).

1    F.3d 976, 994 (9th Cir. 2017) (citations omitted).  Because Petitioner is likely to succeed on the

2    merits of his due process claim, he has "carried [his] burden as to irreparable harm."  *Id*. at 995.

3    As the Supreme Court has recognized, incarceration "has a detrimental impact on the individual"

4    because "it often means loss of a job" and "disrupts family life."  *Barker v. Wingo*, 407 U.S. 514,

5    532–33 (1972).  Accordingly, the Court finds that Petitioner faces irreparable harm absent

6    injunctive relief.

7         **C.  The Balance of the Equities and Public Interest**

8         Finally, the balance of the equities and the public interest tip in favor of granting

9    injunctive relief.  When the government is the nonmoving party, "the last two *Winter* factors

10   merge."  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (citations omitted).  As discussed

11   above, Petitioner has a strong interest in an individualized bond hearing so he can exercise his

12   rights under the Constitution and have an opportunity to abate the imminent harms described

13   above.  And granting relief would not deprive the government of the opportunity to prove to a

14   neutral decisionmaker whether Petitioner poses a threat to the community or a flight risk such that

15   detainment is necessary.

16        The public interest also weighs in Petitioner's favor.  "The public has a strong interest in

17   upholding procedural protections against unlawful detention, and the Ninth Circuit has

18   recognized that the costs to the public of immigration detention are staggering."  *Diaz v. Kaiser*,

19   No. 3:25-cv-05071, 2025 WL 1676854, at *3 (N.D. Cal. June 14, 2025) (citing *Jorge M.F. v.

20   Wilkinson*, No. 21-CV-01434-JST, 2021 WL 783561, at *3 (N.D. Cal. Mar. 1, 2021)); *see also*

21   *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005).

22        All this leads the Court to conclude that Petitioner has demonstrated a due process

23   violation regarding the applicable statutes and regulations sufficient to warrant a bond hearing.

24        **D.  Bond**

25        "The court may issue a preliminary injunction or a temporary restraining order only if the

26   movant gives security in an amount that the court considers proper to pay the costs and damages

27   sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P.

28   65(c).  The Court has "discretion as to the amount of security required, if any," and it "may

20

dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or his conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (citation modified).  Because "the [Government] cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753 F.2d at 727, the Court finds that no security is required here.

**V.    CONCLUSION AND ORDER**

1.    Petitioner's Motion for Temporary Restraining Order (Doc. 2) is **GRANTED in PART**.

2.    Petitioner **SHALL** be provided a *substantive* parole revocation hearing **no later than January 13, 2026,** at which the Immigration Judge will determine whether Petitioner poses a risk of flight or a danger to the community if he is released.

3.    At any such hearing, the Government **SHALL** bear the burden of establishing, by clear and convincing evidence, that Petitioner poses a danger to the community or a risk of flight, and Petitioner **SHALL** be allowed to have counsel present.

4.    The government may file a further brief on the merits of the habeas petition within 45 days.  Alternatively, as soon as it can within that 30-day period, the government may file a notice that it does not intend to file further briefing.  If the government files an additional brief, Petitioner may file a further brief within 30 days thereafter.

5.    The matter is referred to the assigned magistrate judge for consideration of the merits of the petition as quickly as possible.

IT IS SO ORDERED.

Dated:   **December 31, 2025**

UNITED STATES DISTRICT JUDGE